**CONTINENTAL INS. CO. et al. v. I. BAHCALL, Inc.**

Civil Action No. 334.

District Court, E. D. Wisconsin.

June 9, 1941.

316

Wolfe & Hart, of Milwaukee, Wis., for plaintiffs.

Sigman & Sigman, of Appleton, Wis. (Shea & Hoyt, of Milwaukee, Wis., of counsel), for defendant.

DUFFY, District Judge.

The Combined Locks Paper Company (hereinafter referred to as "Paper Company") for years operated a paper mill on the Fox River, known as the Little Chute Mill. The buildings in which the Paper Company carried on its business were owned by the Green Bay and Mississippi Canal Company (hereinafter referred to as "Canal Company"). The lease under which the Paper Company occupied the premises had originally been executed in May, 1916, and was renewed from time to time thereafter. In September of 1938 it was decided to abandon operations at the Little Chute Mill, and shortly thereafter the mill was closed down. The lease was renewed for the year 1939, and the Paper Company was holding thereunder on February 9, 1940.

Under the terms of the lease the Paper Company was required to return the premises to the Canal Company at the end of the term in as good repair as the same were at the commencement of the lease, ordinary wear and tear only excepted. The lessee was made liable for all ordinary damages incurred, whatsoever the source, excepting damages arising from extraordinary causes or from conditions beyond the control of the lessee. The lease likewise required that the lessee, at its own expense, insure the building or buildings on said premises against loss or damage by fire, in such sum as the lessor might require not exceeding $50,000, and that said insurance policies were to be held as additional security for the covenants of the lessee and for the restoration of said buildings in case of loss by fire.

Most of the machinery and equipment which had been used in operating the Little Chute Mill was owned by the Paper Company, which also owned another mill a short distance away on the Fox River, known as the Combined Locks Mill. It was contemplated that a portion of the machinery and equipment which had been used in the Little Chute Mill could be removed to and used in the Combined Locks Mill. The balance of the machinery and equipment which could not be so used was to be scrapped and sold for junk.

Sometime in the fall of 1939, the Paper Company began the process of moving some of the machinery and equipment to its Combined Locks Mill. In December of that year it called for bids for the removal of the machinery and material which could not be thus used. Bids were received from several salvage dealers. Mr. Glenn Carroll, acting for the Paper Company, contacted an officer of the defendant company and requested that it make a bid. Subsequently, on December 22, 1939, Mr. I. Bahcall, president of the defendant, and Mr. Carroll met and discussed the situation. Thereafter Bahcall went through the mill with Herbert Hackworthy, one of the executives of the Paper Company. Carroll requested Bahcall to figure his bid on the material after it was removed from the buildings and ready for loading. Several days thereafter, on December 27, 1939, Bahcall again met with Carroll. The

Paper Company then decided to let the defendant do the entire work, including the removal of the machinery and equipment from the buildings. Carroll testified that he had received bids from other salvage dealers which were as high, if not higher than that finally made by Bahcall, but that he had previous satisfactory business dealings with Bahcall and, in making the agreement, took into consideration Bahcall's reputation as an honest and trustworthy businessman. No written memo of the contract was signed by either of the parties. However, on the following day, December 28, 1939, Carroll, upon behalf of the Paper Company, sent the following letter to Bahcall:

"This will confirm our arrangement relative to dismantling our Little Chute Mill.

"It is our understanding that you will dismantle and remove all the material designated by us from the premises, which we do not want transferred to Combined Locks, and you are to clean the mill and leave it in an orderly condition.

"You are to pay us on the basis of the following schedule, net to us, you to stand cost of dismantling:

(Prices here omitted because not material)

"You will take all necessary precautions to prevent damage to the building and you will carry compensation, public liability, properly (property) damage, and O.A.B. insurance, and that we will be in no way held responsible for any claims while you are dismantling and removing properly (property) from the above mentioned plant."

The work of removing the machinery by the defendant was commenced early in January, 1940. At the same time the Paper Company also had a crew at work removing machinery to be used at the Combined Locks Mill. It was clearly understood that nothing was to be removed from the mill until permission to do so was given by Hackworthy, because when the work was begun it had not been completely decided whether certain of the material was to be scrapped or removed to the Combined Locks Mill. As a decision was made as to each piece, Hackworthy would mark that piece. If it was to go to the Combined Locks Mill, the Paper Company's crew would remove it.

On February 9, 1940, while the work of removal was in progress, a fire was started by an acetylene torch which was being used by one of the workmen. The building known as the pulp mill was destroyed entirely, and other buildings were severely damaged. The plaintiff insurance companies paid to the Paper Company and the Canal Company the sum of $47,723.42, proportioned between the two in accordance with the loss suffered by each. The insurance companies then brought this action against the defendant, alleging that they have been subrogated to all of the rights of the insured, and they seek to recover the monies paid by them to the insured under the fire insurance policies.

The complaint alleges that the damages resulting from the fire were occasioned by the negligence of the servants, agents, and employees of the defendant company. The answer, among other defenses, alleges that the parties to the salvage contract agreed that one Henry Altergott, since deceased, was to do the actual dismantling of the machinery and that he was an independent contractor, and that the defendant is not responsible for any alleged negligent acts on the part of Altergott or his employees. It is admitted that the employee Bruesewitz, who was handling the blowtorch, was in fact an employee of Altergott, to the extent at least that he was working under Altergott's direction as a member of his crew, and was paid by him.

At the time of the pre-trial conference herein, it was agreed that prior to trial before the jury, the court should determine the following question: "On February 9, 1940, was the relationship of Henry Altergott to the defendant that of an independent contractor?" The question is not well worded, as the decision now to be made must not only be whether the relationship of independent contractor obtained between the defendant and Henry Altergott, but likewise whether such a relationship, if established, would relieve the defendant from liability.

There is a sharp conflict in the testimony as to whether the Paper Company had any knowledge whatsoever of the employment of Altergott. Mr. Bahcall states that he mentioned to Carroll that he would have to get a wrecker, and when asked to raise his bid on the price that he would pay for the scrap, he testified he informed Carroll he must first consult with his wrecker. On the other hand, Carroll stoutly denies that the name "Altergott" was ever mentioned to him; that he did not know Altergott,

and had no information that he was doing the dismantling work until after the fire. Hackworthy testified that he had never heard the name "Altergott" mentioned until after the fire occurred. Carroll testified that Bahcall was selected because Carroll knew of the general reputation and the personal trustworthiness of Bahcall. There is no dispute that the prior relations between the defendant and the Paper Company were entirely satisfactory.

The defense raised is an affirmative defense and undoubtedly the burden of proof is on the defendant to establish same.

"As a general rule, no presumption exists that an employee is either a servant or an independent contractor, and the burden is upon the party having the affirmative of the issue to show the relation to be such as to entitle him to recover." 27 Am.Jur. Sec. 59.

It seems reasonable that the Paper Company, knowing its obligations under the lease, would be unwilling to entrust the important work of dismantling the factory to a stranger. If the matter involved were merely a sale of some scrap material, the personal element probably would not enter. The letter written to the defendant by Carroll shows the anxiety of the Paper Company to have the mill turned back to its owner in as good condition as possible. If the dismantling were not carefully done, it was evident that there might be a liability of the Paper Company under the terms of the lease. These circumstances, as well as the selection of the defendant in spite of other bids which were as high or higher, would show that the Paper Company was looking to the defendant for the careful and successful accomplishment of the undertaking.

I must, therefore, hold that the defendant has not satisfied the burden of proof to show that the Paper Company consented to, acquiesced in, or knew about the agreement between the defendant and Altergott.

As we must consider that the Paper Company did not know of the employment of Altergott, the rule of law applies which is well stated in Radel Co. v. Borches, 147 Ky. 506, 145 S.W. 155, 156, 39 L.R.A.,N.S., 227, where the court stated: "The rule is clear beyond agrument that one who undertakes by contract to do for another a given thing cannot excuse himself to the other for a faulty performance, or a failure to perform, by showing that he has engaged another to perform in his place, and that the fault or failure is that of another or independent contractor."

The rule is also stated in 27 Am.Jur., Sec. 49: "Likewise, one who, by a specific agreement, undertakes to do some particular thing, or to do it in a certain manner, cannot, by employing an independent contractor, avoid responsibility for an injury resulting from the non-performance of any duty or duties which, under the express terms of the agreement or by implication of law, are assumed by the undertaker."

It needs no citation of authority to lay down the rule that a party to a contract may assign his benefits under the contract (assuming no express provisions to the contrary), but that he cannot avoid his obligations thereunder without the consent of the party with whom he had contracted.

A party to a contract cannot assign to another his personal duty to fulfill his obligations under the contract, in the absence of the consent of the other party, especially where such party was induced to make the contract because of his personal faith in the fomer's skill, honesty, and reliability. Johnson v. Vickers, 139 Wis. 145, 148, 120 N.W. 837, 131 Am.St.Rep. 1046, 21 L.R.A.,N.S., 359.

Defendant contends that where a contractor has engaged an independent contractor to do certain work, he is not subject to liability for bodily harm or damages caused to a third person by a tortious act or omission of the independent contractor or his servant. This is undoubtedly the rule when the injured person is a stranger or a third party claimant; but the rule does not apply where the owner of property has specifically contracted with a contractor for the doing of work on the former's property. Under such circumstances if the contractor sees fit to engage an independent contractor to do the work, and the latter negligently causes damages, then the contractor cannot escape liability by the application of the independent contractor doctrine.

Defendant, however, contends that the property belonging to the Paper Company which was destroyed was a very small element of the loss and that at least the

Canal Company was a stranger to the contract between the Paper Company and the defendant.

However, under the terms of the lease, the Paper Company was liable to the Canal Company for the sound value of the building, because it was required to return it at the end of the term in good condition, reasonable wear and tear only excepted. Destruction of the building by fire did not relieve the Paper Company of such obligation under the lease. The Paper Company would have been unable to fulfill its obligation to return the building by reason of the destruction by fire. It protected itself against this obligation by carrying adequate fire insurance and thus indemnified itself against possible loss. The fact that the insurance was payable to the Paper Company and/or the Canal Company does not change the situation. It was the Paper Company which sustained the real loss. It was the Paper Company which was bound to indemnify the Canal Company if it failed to turn back the buildings as required by the lease.

Both Bahcall and Altergott knew that the Canal Company had some interest in the property in the building as there was considerable discussion as to whether the Canal Company would agree to the removal of the waterwheels and certain fittings in connection therewith. Under all the circumstances here present, the Canal Company cannot be considered a stranger or a third party.

Under Wisconsin law, when an insurer pays to the insured the amount of the loss, it is subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss. The insurer is entitled to all of the remedies and securities of the assured and to stand in his place. Swarthout v. Chicago & North Western Railway Co., 49 Wis. 625, 629, 6 N.W. 314. The right of subrogation is not limited to cases where the liability of the third person is founded in tort; but any right of the insured to indemnity will pass to the insurer on the payment of loss. 26 C.J., p. 458.

The answer to the question must be that, even assuming that the relationship between the defendant and Altergott was that of independent contractor, such relationship is not a defense to this action.